**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **Jeff Bansek** | : | |
| 1145 North High Street, Unit 201 | : | Case No. 2:21-CV-151 |
| Columbus, Ohio 43201 | : | |
| | : | Judge |
| and | : | |
| | : | Magistrate Judge |
| **Fair Housing Advocates Association, Inc.** | : | |
| 520 South Main Street, #2453 | : | **COMPLAINT FOR DAMAGES** |
| Akron, Ohio 44311 | : | **AND EQUITABLE RELIEF** |
| | : | **(Jury Demand Endorsed Hereon)** |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| **The Jackson on High Condominium Association** | : | |
| *Agent for Service of Process:* | : | |
| K&C Service Corporation | : | |
| 8101 North High Street, Suite 370 | : | |
| Columbus, Ohio 43235 | : | |
| | : | |
| and | : | |
| | : | |
| **The Jackson on High, LLC** | : | |
| *Agent for Service of Process:* | : | |
| John Bonner | : | |
| PO Box 134 | : | |
| Burton, Ohio 44021 | : | |
| | : | |
| and | : | |
| | : | |
| **Link Real Estate Group, LLC** | : | |
| 5000 Arlington Centre Blvd, Suite 2165 | : | |
| Upper Arlington, Ohio 43220 | : | |
| *Agent for Service of Process:* | : | |
| OSAC, Inc. | : | |
| 100 South Third Street | : | |
| Columbus, Ohio 43215 | : | |
| | : | |
| and | : | |

1

**JBH Holdings, LLC**                                  :
*Agent for Service of Process:*                        :
Scott J. Flynn                                         :
P.O. Box 762                                           :
Kent, Ohio 44240                                       :
                                                       :
    and                            :
                                                       :
**Ruscilli Construction Co. Inc.**                     :
*Agent for Service of Process:*                        :
Andrew Fredelake                                       :
5815 Wall Street                                       :
Dublin, Ohio 43017                                     :
                                                       :
    and                            :
                                                       :
**Jim Ambrosio**                                       :
Director of Association Management                      :
Link Real Estate Group, LLC                            :
5000 Arlington Centre Blvd, Suite 2165                 :
Upper Arlington, Ohio 43220                            :
                                                       :
    and                            :
                                                       :
**John Doe**                                           :
                                                       :
              Defendants.    :

## INTRODUCTION

Plaintiffs Jeff Bansek and Fair Housing Advocates Association, by and through undersigned counsel, state the following as their Complaint for Damages and Equitable Relief for violations of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601-3619, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*, and Ohio Revised Code Chapter 4112 against Defendants The Jackson on High Condominium Association, The Jackson on High, LLC, Link Real Estate Group, LLC, JBH Holdings, LLC, Ruscilli Construction Co. Inc., Jim Ambrosio, and John Doe:

## NATURE OF THE CASE

1.  The FHA requires that certain multifamily dwellings developed for occupancy after March 13, 1991, defined in the FHA as "covered multifamily dwellings," contain specified accessibility features to make them accessible to persons with disabilities. 42 U.S.C. §§ 3604(f)(3)(C) and 3604(f)(7). As set forth below, Plaintiffs allege that Defendants have discriminated against persons with disabilities by failing to design and construct covered a multifamily dwelling property at The Jackson on High with these required accessibility features.

## JURISDICTION AND VENUE

2.  The Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 because the claims are set forth pursuant to the laws of the United States of America.

3.  The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because the claims arise out of the same set of operative facts that together they form part of the same case or controversy under Article III of the United States Constitution.

4.  Venue is proper pursuant to 28 U.S.C. § 1391 as the events giving rise to the causes of action occurred in Franklin County, Ohio, within the Southern District of Ohio, Eastern Division.

## PARTIES

5.  Plaintiff Jeff Bansek ("Plaintiff Bansek") is a natural person residing at The Jackson on High condominiums in Franklin County, Ohio.

3

6.     Plaintiff Fair Housing Advocates Association ("Plaintiff FHAA") is a non-profit corporation organized under the laws of the State of Ohio which has as its primary objective the elimination of unlawful housing discrimination and the provision of equal housing opportunity through education, monitoring, conciliation and by enforcing and assisting in enforcing throughout Ohio.

7.     Plaintiff FHAA is an aggrieved party as defined in 42 U.S.C. § 3602(1) and has been injured through diversion of resources and frustration of purpose because of Defendants' conduct as described herein, by having to devote resources to identify and to counteract the conduct and by being impaired in its ability to provide referrals and eliminate from Ohio unlawful discriminatory practice. Persons who have been the victims of Defendants' discriminatory practices are aggrieved persons as defined in 42 U.S.C. § 3602(i). These persons have suffered or may have suffered damages in the form of a loss of their civil rights, economic loss, and emotional distress and are the clientele and constituency of Plaintiff FHAA.

8.     Defendant The Jackson on High Condominium Association ("Defendant Condo Association") is a corporation for non-profit that governs The Jackson on High condominiums.

9.     Defendant The Jackson on High, LLC ("Defendant The Jackson") is a domestic limited liability company that owns The Jackson on High condominiums.

10.    Defendant Link Real Estate Group, LLC ("Defendant Link Real Estate") is a domestic limited liability company that manages The Jackson on High condominiums.

11.    Defendant JBH Holdings, LLC ("Defendant JBH") is a domestic limited liability company that developed The Jackson on High condominiums.

12. Defendant Ruscilli Construction Co. Inc. ("Defendant Ruscilli") is a corporation for profit that was the general contractor that constructed The Jackson on High condominiums.

13. Defendant Jim Ambrosio ("Defendant Ambrosio") is a natural person who, at all times relevant herein, is the Director of Association Management for Defendant Link Real Estate.

14. John Doe, who is a name and address is not currently known, is an architect and/or architectural firm that designed The Jackson on High.

**FACTS COMMON TO ALL COUNTS**

15. The Jackson on High is an eight (8) story property located at 1145 North High Street, Columbus, Ohio 43201 with forty-four (44) residential condominiums and 91 parking spaces in an attached garage. There is a pool on the rooftop that may be reserved for private use by residents to be used by individuals who are not residents of The Jackson on High.

16. The Jackson on High was designed and constructed for first occupancy after March 13, 1991.

17. The Jackson on High is a "dwelling" and contains "dwellings" within the meaning of 42 U.S.C. § 3602(b).

18. The Jackson on High contains "covered multifamily dwellings" within the meaning of 42 U.S.C. § 3604(f)(7)(B).

19. The covered multifamily dwellings at The Jackson on High are subject to the accessibility requirements of 42 U.S.C. 3604(f)(3)(C).

20. The Jackson on High condominiums began construction on September 7, 2008. The Jackson on High condominiums is subject to the accessibility requirements of 42 U.S.C. § 3604(f)(3)(C).

21. The covered multifamily dwellings at The Jackson on High were not designed and constructed in compliance with the accessibility requirements of 42 U.S.C. 3604(f)(3)(C).

22. Defendant Condo Association governs and manages The Jackson on High condominiums.

23. Defendant The Jackson owns The Jackson on High condominiums.

24. Defendant Link Real Estate manages The Jackson on High condominiums.

25. Defendant JBH developed The Jackson on High condominiums.

26. Defendant Ruscilli was the general contractor that constructed The Jackson on High condominiums.

27. Plaintiff Bansek is a person with a disability as defined by the ADA, 42 U.S.C. § 12102(1)(A), Ohio's antidiscrimination law, R.C. 4112.01(13) and the FHA 42 U.S.C. §§ 3601 *et seq*. Plaintiff Bansek is substantially limited in major life activities, including but not limited to, sleeping, sitting, standing, breathing, walking, bending, squatting, lifting, concentrating, and caring for oneself.

28. On or about August 28, 2019, Plaintiff purchased and moved into his property at Defendant The Jackson.

29. Since purchasing a condo and moving into The Jackson, Plaintiff has experienced a multitude of ADA and FHA continuing violations that have interfered with his enjoyment of and ability to use the property including but not limited to denial of his housing accommodation requests and failure to engage in an interactive process.

30.    Since moving into The Jackson, Plaintiff has repeatedly requested accommodations and corrections of the inaccessibility issues of the property, which Defendants have failed to address. Therefore, all violations of the ADA and FHA are continuing violations under the laws.

## INACCESSIBILITY AT THE JACKSON ON HIGH

31.    The following is an illustrative, but non-exhaustive, list of inaccessibility violations created and caused by Defendants in designing, constructing, and maintaining The Jackson on High:

a.    Accessible parking spaces must be located on the shortest possible accessible circulation route to an accessible entrance. The current location of the disabled spaces in the street level parking garage is not the shortest possible circulation route to the building lobby accessible entrance.

b.    The Homeowners' Association community handbook under "pools" states children under 15 must be always accompanied by a resident adult 18 and over. The age limit should be 10 under the FHA.

c.    FHA standards say interior doors on accessible routes must be able to open using 5 pounds or less of pressure. All interior hallway corridor doors on Floors 2-5 require more than 5 pounds of pressure to open.

d.    The garage door keypad on the west side of the property is too high.

e.    The Third Floor common balcony is lacking a beveled threshold.

f.    The door on the Third Floor common balcony closes too fast, i.e., under 5 seconds.

g.      The door on the Third Floor common balcony is too hard to open. Although it is an exterior door and is not subject to the maximum 5 pounds of force to open, it can be adjusted for easier operation as a reasonable accommodation.

h.      The disabled parking signs on the disabled parking are too low.

i.      The disabled parking signs on the disabled parking spaces have the incorrect fine amount listed, specifically $250 instead of $500.

j.      The slope of the accessible route from the disabled spaces is too steep.

k.      The slope of the accessible parking spaces is too great.

l.      The accessible parking spaces and the access aisle are not level and are not safe.

m.      The entry from the street level parking garage by the disabled spaces to the building's main lobby and elevators is obstructed, making it inaccessible.

n.      The door swing clearance from the parking garage to the lobby lacks the required pull side (left) 18" clearance to the left side of the door. This is obstructed by a garbage can, wheeler dolly, traffic cone and two green pull/push carts.

o.      The door from the parking garage to the lobby lacks the maneuvering space parallel to the doorway beyond the latch, which shall be 18" minimum.

p.      The door from the parking garage to the lobby lacks the required 60" front facing perpendicular approach clearance to the door due to obstructions that impede into the requires minimum 60" approach clearance. Obstructions include the brown security pillar, a garbage can, two green push/pull carts, wheeled dolly, and a traffic cone.

q.      Operable parts, such as the trash chutes, shall be operable with one hand and shall not require tight grasping, pinching, or twisting of the wrist. The trash chute

hardware on Floors 2-7 is not accessible. Plaintiff is unable to open the trash chutes with one hand due to the necessity to disengage the locking mechanism at the same time as pulling out and down on the trash chute. Plaintiff is unable to secure a good grip on the small pull bar on the trash chute due to its small size and due to pain, numbness and tingling in his hands and fingers.

r.     The door that needs opened to access the in-wall trash chutes on Floors 2-7 closes in under 5 seconds required minimum door close speed, making the route to the trash chutes inaccessible.

s.     The closing speed of the doors to access the trash chutes close before 5 seconds.

t.     The route to the deck is inaccessible because it has a step and no ramp.

u.     The route to the pool in inaccessible because it has two steps and no ramp.

v.     The route is not connected due to the presence of steps at the deck and pool.

w.     There is no handrail at the step leading up to the deck area.

x.     There is only one handrail at the pool entry.

y.     There are no handrails by the two steps surrounding and leading up to and down from the pool.

z.     A motorized fixed or portable pool chair lift, or sloped entry, is required at ADA covered pools with less than 300 linear feet of length. Neither type of accessible entry to the pool is present. The pool can be rented on behalf of members to the public, so it is also a public accommodation under the ADA.

aa.    The door that needs to be opened to access the trash room in the street level parking garage closes in under the required 5 second minimum closing speed, making the route to the trash room inaccessible.

bb.     The bathroom on the Fourth Floor is open to the public when the pool is rented. It is also used by residents and guests. The bathroom is covered under the ADA and the FHA. The Mirror over the lavatory height is too low at 70" instead of 74" minimum.

cc.     The paper towel dispenser in the Fourth Floor bathroom is too high at 58" instead of 48" maximum.

dd.     The pipes under the sink of the Fourth Floor bathroom should be insulated.

ee.     The door to the restroom on the Fourth Floor bathroom closes too fast because it closes under 5 second required minimum closing speed.

ff.     The toilet is inaccessible because the required minimum space measured from the center of the toilet to the nearest edge of the sink is not wide enough. It is 33" instead of the required 42" minimum.

gg.     The soap dispenser is too high at 50". The maximum height is 48".

hh.     The route to the Fourth Floor bathroom is not accessible. There is a hallway door on the accessible route from the bathroom leading back to the elevators. The door lacks the required minimum 18" door swing clearance (right) for a pull side door. The clearance space is only 10".

ii.     There are not accessible routes on the Second and Third Floors from the hallway to the elevators, moving south to north. Routes are not accessible as the door width clearance is not the required 32" minimum width open to 90 degrees on either floor.

jj.     The High Street entrance is inaccessible because the right door closing speed is too fast, under 5 seconds.

kk.     The High Street entrance is inaccessible because the left door closing speed is too fast, under 5 seconds.

ll.     The key fob scanner at the High Street entrance is inaccessible. The maximum height under the design standard with frontal access is 48". The height is 52", making the scanner inaccessible.

mm.     The key fob scanner lasts 2 seconds until the door latch locks again. The time from scanning the key fob until the entry door locks back up needs extended to at least 5 seconds.

nn.     The intercom on the High Street entrance is inaccessible. The maximum height under the design standard with frontal access measured from the ground to the highest operable part of the intercom system is 48". The height is 67.25, making the intercom system inaccessible.

oo.     The mailboxes in the lobby are inaccessible. The maximum height under the FHA design standard for the wall of mailboxes on forward approach is 48", measured from the ground to the keyhole in the upper most mailboxes. The height is 65", making the mailboxes inaccessible.

pp.     The drop box for residents is too high, exceeding 48" high.

qq.     In Unit 201, the sliding patio door is inaccessible because it is 27.25" wide, instead of the 32" minimum width.

rr.     In Unit 201, the sliding patio door interior is inaccessible because the thresholds at doors to secondary exterior spaces cannot exceed ¾" in height and must be beveled, but the threshold on the interior side of the sliding patio door is 2.75" high and is not beveled.

ss.    In Unit 201, the sliding patio door exterior door is inaccessible because the door exits onto a patio made of pervious materials. The outside landing is required to be maintained within ½" of the interior floor level and beveled. The landing is greater than 1" and is not beveled.

tt.    In Unit 201, the French doors interior to the exterior balcony are inaccessible. Thresholds at doors to secondary exterior spaces cannot exceed ¾" in height and must be beveled. The threshold on the interior side of the French doors is 4.75 high and is not beveled.

uu.    In Unit 201, the French doors exterior is inaccessible. Thresholds at doors to secondary exterior spaces where the surface of the exterior balcony is impervious, the outside landing may be dropped a maximum of 4" below the floor level of the interior of the dwelling unit to prevent water infiltration at door sills. The maximum height allowed for the threshold on the exterior side of this secondary door to the exterior spaces is ¾". The total drop of the outside landing may be a maximum of 4.75" measured from the balcony to the top of the threshold. It measures too high at 6.75". The exterior side of the threshold is also required to be beveled and it is not.

vv.    The French door/balcony design violations are also present in the following building units: 202 (one balcony), 203 (two balconies), 301 (one balcony), 302 (one balcony), 303 (two balconies), and 401 (two balconies).

ww.    There is a north/south hallway route with push and pull side double doors on the Second Floor hallway leading from condo units to the elevators. The required

minimum door closing speed is 5 seconds, but the push and pull side doors close in under 5 seconds on the Second Floor.

xx. There is a north/south hallway route with push and pull side double doors on the Third Floor hallway leading from condo units to the elevators. The required minimum door closing speed is 5 seconds, but the push and pull side doors close in under 5 seconds on the Third Floor.

yy. There is an east/west hallway route with push and pull side double doors on the Second Floor leading from the condo units to the elevators. The required minimum door closing speed is 5 seconds, but the Second Floor push and pull side doors close in under 5 seconds.

zz. There is an east/west hallway route with push and pull side double doors on the Third Floor leading from the condo units to the elevators. The required minimum door closing speed is 5 seconds, but the Third Floor push and pull side doors close in under 5 seconds.

aaa. There is an east/west hallway route with push and pull side double doors on the Fourth Floor leading from the condo units to the elevators. The required minimum door closing speed is 5 seconds, but the Fourth Floor push and pull side doors close in under 5 seconds.

bbb. There is an east/west hallway route with push and pull side double doors on the Fifth Floor leading from the condo units to the elevators. The required minimum door closing speed is 5 seconds, but the Fifth Floor push and pull side doors close in under 5 seconds.

ccc.    The pet waste station on the property provided as a convenience to residents is inaccessible. The pet waste station is located on the south side of the building on an inaccessible route. Further, you must leave the paved walkway and walk about three feet on loose gravel to access it. The height is also inaccessible at 57" high.

ddd.    The security gate on the south entry/exit is inaccessible. The entry/exit lacks an 18" pull side (right) security gate door swing clearance. The paver sidewalk is wide enough to provide for the required minimum 36" wide accessible walkway, but it is still not wide enough to make the route accessible.

eee.    The security gate on the south entry/exit is also inaccessible because the security gate was installed which requires one to step to the right and off the paver sidewalk and onto loose gravel to allow the 18" pull side gate swing clearance to open the gate and continue on the route to the building.

fff.    The security gate on the south entry/exit is also inaccessible because it requires smooth surface toe kicks on the push side of gates that extend to within 10" of the ground. This gate on the south side of the building is missing the push side toe kick.

ggg.    The south entry door to the parking garage closes too fast, under the 5 second required minimum closing speed.

hhh.    The south entry door to the parking garage is lacking the pull side (left) 18" door swing clearance to enter the parking garage. One must step to the left and off the poured concrete and onto loose gravel to have the 18" latch side (left) door swing clearance to open the door to the building's parking garage.

14

iii.    The southwest building entry/exit is inaccessible. The smooth surface toe kick from the push side of the security gate is missing.

jjj.    The southwest building entry/exit is also inaccessible because there is a step leading up to this security gate.

kkk.    The southwest building entry/exit is also inaccessible because there are steps that lead up to a landing to access the door leading into the parking garage, making the route inaccessible.

lll.    The southwest building entry/exit is also inaccessible because the pull side (left) of the door leading into the parking garage does not allow the 18" pull side door swing clearance.

mmm.    The frontal approach to the door on the landing at the top of the stairs to the southwest building entry/exit does not have the required minimum 60" frontal approach pull side door swing clearance for entry.

nnn.    The stair riser height is too high on the rooftop deck. The step leading up to the Fifth Floor common/public use deck is too high. The riser height is 9.25". The maximum height allowed is 7".

ooo.    The stairs leading into and out of the pool do not have uniform riser heights. The riser heigh of the first 5 steps walking up the stairs from inside the pool are 9". The riser height for the 6th and top step is 10.75".

ppp.    The Second Floor lobby elevator is inaccessible because the elevator control buttons are obstructed by furniture that intrudes into the required 48" x 30" clear floor space.

qqq. The Fourth Floor lobby elevator is inaccessible because the elevator control buttons at the elevator on the north side of the lobby are obstructed by furniture that intrudes into the required 48" x 30" clear floor space.

rrr. The operable door hardware (pull latch) that needs to be pulled to open the accessible door from the outside of the Fifth Floor rooftop deck/pool area to the inside of the building is too high at 54" in height. The maximum height is 48".

sss. The wall mounted emergency phone in the lobby of the Fifth Floor is inaccessible because it is too high at 62.5" from the ground to the most operable part of the phone. The maximum height allowed is 48".

ttt. The wall mounted emergency fire alarm on the First Floor lobby is inaccessible because it is obstructed by a garbage can that intrudes into the required 48" x 30" clear floor space.

uuu. The wall mounted fire extinguisher in the street level parking garage to the left of the accessible entry to the building lobby is inaccessible because there are obstructions that are present that intrude into the required 48" x 30" clear space.

vvv. The thermostats mounted to the walls in the common hallways on Floors 2, 4 and 6 are mounted higher than the maximum 48" to the highest operable part and, thus, are not accessible.

www. The couch on the Second Floor lobby is not accessible because it lacks the required 36" wide accessible route to access it.

xxx. Emergency call buttons located on the Fourth Floor lobby are obstructed by furniture and not accessible due to the lack of the required clear floor space.

16

yyy.    The recessed in-wall cabinets containing fire extinguishers on all levels contain pull handles on the cabinet doors. The pull handles are too high. The highest operable part to the cabinet, the pull handle, can be a maximum of 48" in height from the floor surface. The bottom of the pull handles on all cabinets measure 51.75" in height.

zzz.    The width between handrails on the egress flight of stairs to the parking garage entry on the southwest side of the building is not the required minimum 36" width for an accessible route.

aaaa.   The handrail to the south, at the top of the egress steps landing, to the parking garage entry on the southwest wide of the building is too high at 42.75" when the maximum height allowed is 38".

bbbb.   The wall mounted handrail on the egress flight of stairs to the parking garage entry on the southwest side of the building is not at a consistent height above each walking surface, stair tread and stair nosing.

cccc.   The two handrails on the egress flight of stairs to the parking garage entry on the southwest side of the building are not the same level height to one another above the walking surface, stair tread and stair nosing. The north handrail is 35.75", and the south handrail is 37.25 in height.

dddd.   The handrail affixed to the building by the egress stairs to the parking garage entry on the southwest side of the building is not securely fastened and moves to varying heights while gripping it.

eeee.   The gate on the southwest wide of the building is missing the push side toe kick.

ffff.   The gate on the south side of the building is missing the push side toe kick.

gggg. In all egress stairwells from the underground parking garage stairwell through Floors 1-7, there are handrails that are higher than the maximum allowed 38" height measured vertically to the top of the gripping surface of the handrails.

hhhh. In all egress stairwells from the underground parking garage stairwell through Floors 1-7, there are handrails that are not at consistent heights above stair nosings and walking surfaces. The height of the handrail measured from the surface of each step varies drastically.

iiii. In all egress stairwells from the underground parking garage stairwell through Floors 1-7, the two parallel handrails are not at consistent level heights with each other above stair nosings and walking surfaces. The height of each of the two parallel handrails measured from the surface of each step varies dramatically.

32. On or about October 29, 2020, FHAA's Executive Director, Vincent B. Curry, inspected The Jackson on High and documented the above violations. The FHAA diverted resources from its education and outreach work to investigate the allegations described herein.

## PARKING

33. To no avail, Plaintiff Bansek has repeatedly requested accommodations and attempted to work with Defendants to correct the inaccessible parking. To date, Defendants have completely failed to accommodate Plaintiff Bansek, to enforce the disabled parking and to correct the disabled parking violations.

34. Defendants have never enforced the disabled parking.

35. On or about September 29, 2019, Plaintiff Bansek emailed Defendant Link Real Estate to request an accommodation that one of the two designated disabled parking spaces in The

18

Jackson on High's parking garage be assigned to him. Plaintiff Bansek explained that he has difficulty navigating the tight space of his assigned parking space when there are cars on either side of him because it is a very tight space between his vehicle and the steel pole of the lift.

36.     Plaintiff Bansek notified Defendant Link Real Estate that he has had difficulties using the disabled parking spaces in the parking garage due to numerous people parking in the spaces and access aisles illegally. Plaintiff Bansek stated that he was forced to park at a meter and walk a couple of blocks because four (4) scooters were parked illegally in one disabled parking space and a car was parked illegally in the other parking space.

37.     Plaintiff Bansek noted that state and federal law require proper signage designating the parking space as disabled parking to deter persons from parking illegally. Plaintiff Bansek requested an accommodation of proper signage be placed at each of the two disabled parking spaces. Plaintiff Bansek reiterated his request for an accommodation for his assignment of a disabled parking space with a sign posted that is an assigned parking space.

38.     In support of his accommodation, Plaintiff Bansek requested that an email be sent to residents advising them not to park cars or scooters in the disabled parking spaces and access aisles unless they have the required State of Ohio issued disabled parking permit.

39.     On October 2, 2019, Defendant Ambrosio emailed a response to Plaintiff Bansek's September 29, 2019 email. Defendant Ambrosio thanked Plaintiff Bansek for making Defendant Link Real Estate aware of the situation and stated that Defendant Link Real Estate would work quickly to see that the disabled parking spaces each have a sign added to them to provide extra awareness that the spaces were for people with disabilities.

40. Defendant Ambrosio indicated that Defendant Link Real Estate would send an email to the building residents to let them know that those spaces are only to be used by persons with disabled-marked vehicles.

41. Regarding Plaintiff Bansek's accommodation request for the assignment of disabled parking to him, Defendant Ambrosio stated that he would check with Defendant Condo Association's attorney to see if that can be done. Defendant Ambrosio explained that the space is not currently tied to a deed for a condominium in the building, Defendant Condo Association may not be able to do that without recording it with the county. Defendant Ambrosio concluded that one of the disabled parking spaces could be used exclusively by Plaintiff Bansek, as Defendant Link Real Estate was not aware of any other disabled-marked vehicles owned by any other building residents.

42. Plaintiff Bansek sent a follow-up email to Defendant Ambrosio on October 7, 2019 asking when he expected the signs to be posted because "[e]veryone is still parking in those two [disabled] spaces."

43. Defendant Ambrosio emailed Plaintiff Bansek a response on October 10, 2019 indicating that he would check with maintenance on the signs and assuring Plaintiff Bansek that he would send an email to residents regarding appropriate use of the disabled spaces.

44. On October 11, 2019, Plaintiff Bansek emailed Defendant Ambrosio asking for notification when he heard back from maintenance.

45. On October 11, 2019, Defendant Ambrosio notified Plaintiff Bansek that the disabled parking space signs were ordered that day.

46. On October 20, 2019, Plaintiff Bansek notified Defendant Ambrosio that even though the disabled parking signs went up last week and an email was sent to residents about the

disabled parking spaces nine to ten (9-10) days ago, there are still scooters parked in the disabled spaces. Plaintiff Bansek requested that a second email about the disabled parking spaces be sent or questioned if there were other options available.

47. After not receiving a response to his October 20, 2019 email, Plaintiff Bansek sent a follow-up email to Defendant Ambrosio on October 24, 2019.

48. On October 25, 2019, Defendant Ambrosio emailed Plaintiff Bansek stating that Defendant Link Real Estate Group was "trying to identify and contact the scooter owners directly in lieu of repeated email blasts to the entire building."

49. On November 6, 2019, Plaintiff Bansek emailed Defendant Ambrosio, informing him of the suspected owner of the red scooter. Plaintiff Bansek also notified Defendant Ambrosio that he overheard people saying that a tow truck could not fit in through the overhead garage door and, therefore, people are not concerned about being towed and will not move their vehicles illegally parked in the disabled parking spaces.

50. On November 7, 2020, Plaintiff Bansek notified Defendants Ambrosio and Link Real Estate that the signage did not comply with the ADA because it listed $250 as the fine for illegally parking in the disabled parking spaces instead of $500. Plaintiff Bansek formally requested that Defendants Ambrosio and Link Real Estate correct the signage and height to comply with the law. In addition, Plaintiff Bansek notified Defendants Ambrosio and Link Real Estate that there should be four (4) disabled parking spaces instead of only two (2) because the parking garage had eighty-eight (88) parking spaces total.

51. Also, on November 7, 2019, Plaintiff Bansek emailed Defendant Ambrosio to notify him of chronic issues with the disabled parking spaces after the first notice one month prior regarding illegal use of the disabled parking spots. Plaintiff Bansek informed Defendant

Ambrosio that a car was illegally parked in the disabled parking space where he had been parking. Plaintiff Bansek stated that the illegally parked car had a note on the dashboard to telephone if the space was needed. Plaintiff Bansek indicated that the two scooters continue to park illegally in one of the disabled parking spots because they do not fear being towed. Plaintiff Bansek questioned why the illegally parked vehicles could not be towed.

52.     Finally, on November 7, 2019, Plaintiff Bansek asked Defendant Ambrosio to correct him if he were wrong about any aspect of the law that he cited regarding the disabled parking spaces, such as the number of spaces. Defendants have not disputed Plaintiff Bansek's recitation of the ADA and FHA on any of enumerated violations.

53.     On November 21, 2019, Plaintiff Bansek emailed Defendant Ambrosio to notify him of the owners of the two scooters that continued to park in the disabled parking spot.

54.     On November 22, 2019, Defendant Ambrosia emailed Plaintiff Bansek to inform him that Defendant Link Real Estate would reach out to the scooter owners directly.

55.     On November 26, 2019, Plaintiff Bansek emailed Defendant Ambrosio to ask if the $500 disabled parking space fine signs had been ordered.

56.     On May 1, 2020, Plaintiff Bansek emailed Defendant Ambrosio to renew his complaints about vehicles illegally parking in the disabled parking spots. Plaintiff Bansek notified Defendant Ambrosio that "numerous residents of the building have been parking illegally in the FHA ("Fair Housing Authority") designated disability parking spaces. Notices were sent to residents in October 2019 advising not to park there without proper parking permits, and the problem has persisted without enforcement."

57. Plaintiff Bansek explained that he attempts to park in one of the two disabled parking spaces but there are times when vehicles are illegally parked in both spots. Plaintiff Bansek stated that a disabled parking spot is a necessity due to his disabilities. Plaintiff Bansek reminded Defendant Ambrosio that he previously requested that one of the disabled parking spaces be assigned to him as a reasonable accommodation.

58. Plaintiff Bansek asserted that he was being discriminated against because of his disability based on the totality of circumstances, including but not limited to, the following: (1) not enforcing the law regarding disabled parking spaces, which has caused Plaintiff Bansek to not have the necessary access to a disabled parking space at times; (2) not receiving an assigned disability parking space as a reasonable request for accommodation; and, (3) being told that some of the residents that have been parking vehicles and scooters illegally in designated disability parking spaces have complained about Plaintiff Bansek's use of the disabled parking space and failing to advise the other owners to move their vehicles.

59. Plaintiff Bansek again formally requested an accommodation of an assigned disabled parking space, as well as enforcement for those illegally parked in disabled parking spaces.

60. Defendant Ambrosio responded to Plaintiff Bansek's May 1, 2020 email on May 19, 2020. Defendant Ambrosio informed Plaintiff Bansek that the assigning of the disabled parking space would be the decision of Defendant Condo Association and not Defendant Link Real Estate. Defendant Ambrosio indicated that he would notify Plaintiff Bansek when the Board of Directors of Defendant Condo Association met virtually so Plaintiff Bansek could participate in the Board meeting.

61.     Plaintiff Bansek sent a response email to Defendant Ambrosio on May 20, 2020. Plaintiff
        Bansek indicated that he has been requesting an assigned space through Defendant Link
        Real Estate since September 2019 and this was the first time that he heard that he must
        seek and receive approval from Defendant Condo Association's Board of Directors.

62.     Plaintiff Bansek asked who was responsible for enforcing and towing vehicles parked
        illegally in the disabled parking spaces. Plaintiff Bansek stated that he has complained
        about the illegally parked vehicles to Defendant Link Real Estate numerous times since
        September 2019 to no avail. Plaintiff Bansek indicated that other than Defendant Link
        Real Estate sending out an email to residents and placing a note on the ground in
        September 2019, no enforcement action has been taken.

63.     Plaintiff Bansek complained that the violations have persisted for over nine (9) months
        and people have continued to park illegally in the disabled parking spaces, denying
        access to persons with disabilities.

64.     On May 21, 2020, Plaintiff Bansek emailed Defendant Ambrosio reminding him of his
        requests for an accommodation of an assigned parking space since September 2019.
        Plaintiff Bansek reiterated that the first time he learned that he needed to ask Defendant
        Condo Association's Board of Directors for an assigned parking space was May 20,
        2020. Plaintiff Bansek requested the names, title, and contact information for Defendant
        Condo Association's Board of Directors.  Defendant Ambrosio refused to provide said
        information.

65.     Plaintiff Bansek asked Defendant Ambrosio to present his request regarding a request for
        an assigned space to the Defendant Condo Association's Board of Directors due to the
        coronavirus pandemic. Plaintiff Bansek also reiterated that, since September 2019, he has

complained numerous times about the lack of access to the disabled parking spaces due to persons parking in clearly designated disability parking spaces without the State of Ohio issued disability parking permits.

66. Plaintiff Bansek complained that no enforcement action occurred to the extent that the parking violations persisted every single day since his initial complaint in September 2019. Plaintiff Bansek explained there were numerous vehicles, including scooters, motorcycles, and bicycles, that combine to limit access to the disabled parking spaces by both directly parking in the disability spaces and/or obstructing the access aisles. Plaintiff Bansek stated that this included bicycles that both hang from a wall rack and that are also parked on the ground intruding into the disabled parking spaces and further limiting and actually preventing entering and exiting of a vehicle and/or opening of a vehicle door due to their presence.

67. Plaintiff Bansek requested that his appeals for enforcement be presented to Defendant Condo Association's Board of Directors and Defendant Link Real Estate Group.

68. On May 21, 2020, Plaintiff Bansek provided copies of his disability placard, vehicle registration and State of Ohio disability placard registration to Defendant Ambrosio and asked that they be provided to Defendant Condo Association's Board of Directors and Defendant Link Real Estate as needed.

69. On June 8, 2020, Defendant Ambrosio informed Plaintiff Bansek that the next regularly scheduled Board of Directors meeting was August 2020, but that he was going to suggest that the Board of Directors have a meeting within the next couple of weeks. Defendant Ambrosio stated that he would inform Plaintiff Bansek when the meeting was scheduled so Plaintiff Bansek could make his requests to the Board of Directors. Defendant

Ambrosio indicated that he would provide Plaintiff Bansek's requests to the Board of Directors in writing prior to the Board of Directors' meeting. Defendant Ambrosio also stated that he would contact Defendant Condo Association's legal counsel for their input on the requests so they could advise the Board of Directors on compliance regarding Defendant Condo Association's governing documents and the ADA.

70. On July 2, 2020, Defendant Ambrosio stated that he understood Plaintiff Bansek's request regarding the assignment of a parking space, but he asked Plaintiff Bansek to specify the accommodations that he was requesting regarding the pool and deck.

71. On July 9, 2020, Defendant Ambrosio emailed Plaintiff Bansek to inform him of the Board of Directors' decision. Defendant Ambrosio indicated that the Board of Directors approved designating the disabled parking space closer to the lifts for his exclusive use. Defendant Ambrosio indicated that he would be on vacation and asked for "some time to arrange for the necessary signage for the area."

72. Defendant Ambrosio next stated that this would leave one disabled parking space for any other building residents or guests to use and "the issue with the scooters taking up part or all of that space at times is well known." Defendant Ambrosio indicated that he and the Board of Directors were working on options to provide an alternative area for those scooters to be parked. Defendant Ambrosio asked on behalf of the Board of Directors if Plaintiff Bansek's space underneath the lift would be available for scooters to park.

73. On or about September 29, 2020, Plaintiff Bansek was unable to enter his car for approximately four (4) days due to an illegally parked scooter blocking access to Plaintiff Bansek's car door. Due to his disabilities, Plaintiff Bansek was physically unable to move the scooter.

74. Plaintiff Bansek waited in the parking garage on several occasions for approximately 20 minutes hoping to catch the scooter owner and request that he or she move the scooter.

75. One occasion, Plaintiff Bansek also left a note on the scooter requesting that the owner move the scooter as Plaintiff Bansek was unable to access his car. The note was removed from the scooter, but the scooter remained illegally parked.

76. Plaintiff Bansek was forced to pay for Ubers to obtain his groceries and medications during the days the scooter blocked access to Plaintiff Bansek's vehicle.

77. On several occasions, trash and other items have been placed in the disable parking which friends of Plaintiff Bansek moved. Either the next day or some time shortly thereafter, the trash and/or other items were placed back in the disabled parking and/or in an adjacent area that blocked at least partial access to the disabled parking.

78. To date, no signage designating the disabled parking space as being assigned to Plaintiff Bansek has been provided.

**DOORS**

79. The ADA mandates that public doors require less than five (5) pounds of pressure to open and close.

80. Over 90% of the doors, including the trash chute doors, require greater than the specified pressure to open and/or hold less than the specified pressure to close.

81. The latches on the trash chute further inhibit the ability to open and dispose of trash.

82. As a result, Plaintiff Bansek has great difficulty opening doors in the building because the doors require too much pressure to open and/or hold too little pressure causing the door to close too quickly.

83. On or about September 23, 2020, Plaintiff Bansek had surgery on his right shoulder because of his disability.

84. Plaintiff Bansek had his shoulder and arm in a sling for approximately six (6) weeks.

85. Residents of The Jackson are required to place their trash in chutes on their respective floors.

86. The trash chutes are not accessible, and Plaintiff Bansek was unable to open the chute with his right arm in a sling. Therefore, Plaintiff Bansek placed his trash next to the chute.

87. On October 5, 2020, Defendant Link Real Estate sent an email to residents about the trash being left beside the chute.

88. On October 6, 2020, Plaintiff Bansek emailed Defendant Link Real Estate to report that he was the individual leaving the trash by the chute on the Second Floor. Plaintiff Bansek explained that he was unable to place his trash in the chute due to his disability which worsened because of recent surgery. Plaintiff Bansek explained that he was also unable to walk his trash to the dumpster in the parking garage as the entrances were not accessible because of his disabilities.

89. Plaintiff Bansek requested an accommodation that Defendant Link Real Estate designate someone to pick up his trash three days per week. Plaintiff Bansek notified Defendant Link Real Estate that he would place his trash outside his unit's door at 8:00 a.m. every Tuesday, Thursday, and Saturday. Plaintiff Bansek stated that he would do this until hardware is placed on the trash chutes that would allow him to operate them.

90.     On October 8, 2020, there were signs on the Second Floor at the elevators and trash chute to put the garbage down the chute and not to leave it outside the door as it will attract rodents to the floor.

91.     On October 9, 2020, Defendant Link Real Estate sent an email to residents about the Second Floor trash. Defendant Link Real Estate notified residents that an individual living on the Second Floor had a disability that made it impossible to open the trash chute and throw the bags inside. Defendant Link Real State requested that the residents of the Second Floor deposit any trash left by the chute into the chute and anyone who is physically unable to use the trash chute to make reasonable attempts to limit the number of bags placed next to the chute door. Defendant Link Real Estate stated that the maintenance team would be asked to monitor this while walking common hallways during the time the team was on site, which the maintenance team failed to do.

92.     On October 12, 2020, Plaintiff Bansek requested an accommodation from a maintenance employee, Charles Last Name Unknown ("LNU"), of Defendant Link Real Estate to dispose of his trash. The individual refused and, instead, walked with Plaintiff Bansek to the trash chute and held it open for Plaintiff Bansek.

93.     No accommodation has been provided by Defendants.

94.     Plaintiff Bansek began taking his trash to other floors to attempt to open those trash chutes or obtain assistance from someone.  Plaintiff Bansek was unable to open any trash chute in the building or obtain assistance from maintenance employees or other building tenants.

95.     On October 27, 2020, there was a sign on Plaintiff Bansek's trash that read, "PLEASE DO NOT LEAVE **YOUR** TRASH HERE[.] OPEN DOOR AND DEPOSIT INTO TRAP

DOOR DESIGNED FOR EASY TRASH DISPOSAL. P.S. WELCOME TO THE JACKSON."

96.   There was another sign on the trash chute that read, "TRASH CHUTE HERE[.] OPEN DOOR AND LOOK."

97.   Even without his current medical restrictions, Plaintiff Bansek has difficulty opening the trash chute and disposing of his trash due to his disabilities and the inaccessibility of the trash chutes. Plaintiff Bansek is currently restricted from pulling, pushing, twisting, or grabbing, and lifting anything heavier than a cup of coffee.

98.   The trash chutes on all floors of The Jackson remain inaccessible to Plaintiff Bansek.

**POOL**

99.   On July 5, 2020, Plaintiff Bansek emailed Defendant Ambrosio regarding his request for accommodations regarding the pool and deck area:

> Due to physical disabilities with my back legs and feet, I have balance issues and a medically documents history of falls due to back pain and nerve damage and pain in my legs and feet. This weekend I attempted to access and enjoy the deck and pool area, even though I was experiencing an increase in pain in my back and legs and feet. I was unable to access the deck and pool area for the first time as a person with disabilities due to the lack of a wheelchair accessible ramp. I wasn't able to negotiate the step to the deck, especially without the fear of falling. That was further hindered by the lack of a handrail to hold onto. In the past I have been able to access the deck and pool area because I'd only go up there if I felt I could physically access and navigate the area up and down the steps safely. If I felt I could not do so on a particular day, I'd simply avoid going to that common/public area. I want the ability to enjoy the deck and pool area equally any day of the week, not just on days when I feel I can go up and down the steps safely.

> Furthermore, in the coming months, I will [be] required to wear a back brace and use a wheeled walker daily for an extended period of time post-surgery. I will be medically and physically unable to go up and down stairs at all during this time. Thus, I will continue to not have equal access to the pool and deck area as a person with disabilities as there isn't a wheelchair accessible ramp and railings with a direct access route to the

> deck and pool. I am formally requesting of the HOA BOD that the deck and pool areas be in compliance with the Fair Housing Act and the Americans with Disabilities Act regarding pool and deck areas as shared common areas and public accommodations under the law. I believe a wheelchair accessible ramp and railings with an accessible route to the deck and the pool are required by law, and I'm requesting such at the expense of the HOA[.]

100. On or about July 6, 2020, Defendant Ambrosio thanked Plaintiff Bansek for the information and indicated that he would present the information to the Board of Directors at the meeting that night.

101. On or about July 8, 2020, Plaintiff Bansek again complained about the pool and deck area. Plaintiff Bansek indicated that the area is a public accommodation in that residents may reserve the pool/deck on behalf of an outside organization with the approval of Defendant Condo Association's Board of Directors. Plaintiff Bansek notified Defendant Ambrosio that there were violations of the ADA, including but not limited to, an accessible route to the deck and an accessible route to the pool. Plaintiff Bansek requested that Defendant Ambrosio and/or Defendant Link Real Estate and/or Defendant Condo Association's Board of Directors review the law and the pool and deck area to determine if there are violations and, if there are, to remedy the violations.

102. On or about July 9, 2020, Defendant Ambrosio indicated that they were getting information and pricing for the installation of a ramp and railing where the paver walkway meets the wooden pool deck. Defendant Ambrosio asked Plaintiff Bansek to "allow a few weeks…to coordinate the info between a contractor and the board."

103. To date, Defendants have not remedied the violations in the pool and deck area.

## COUNT I: FHA AND R.C. CHAPTER 4112 VIOLATIONS

104.    Plaintiffs reincorporate, as if fully realleged herein, the foregoing paragraphs of the Complaint.

105.    Defendants have failed to design or construct, and to provide accommodations, The Jackson on High in accordance with 42 U.S.C. § 3604(f)(3)(C). The violations are outlined in paragraph 83(a)-(iiii).

106.    By failing to design, construct, and to provide accommodations, The Jackson on High in accordance with the FHA, Defendants made housing unavailable because of disability in violation of Section 804(f)(1) of the FHA, 42 U.S.C. § 3604(f)(1), and parallel provisions under R.C. 4112.02(H).

107.    By failing to design, construct, and to provide accommodations, the dwellings in accordance with the FHA, Defendants discriminated in the terms, conditions, or privileges of the sale of The Jackson on High property in violation of Section 804(f)(2) of the FHA, 42 U.S.C. § 3604(f)(2), and parallel provisions under R.C. 4112.02(H).

108.    Plaintiffs Bansek and FHAA are "aggrieved persons" as defined by 42 U.S.C. § 3602(i) and R.C. 4112.01 and have suffered damages because of Defendants' conduct described above.

109.    Defendants' discriminatory actions and practices described above were intentional and in wanton and reckless disregard of the rights of others.

110.    As a result of the acts and conduct of the Defendant, Plaintiff Bansek has suffered and been damaged in the right to contract for and to otherwise rent the home he negotiated and contracted for and has incurred damages in the diminution of value in his housing.

111. The acts and conduct of the Defendants have caused and continue to cause the Plaintiff Bansek humiliation, embarrassment, emotional distress, and anxiety, and further had the purpose and effect of denying to the Plaintiff state and federally secured rights of fair housing.

112. As a result of the acts and conduct of the Defendant, Plaintiffs have suffered and continue to suffer damages.

## COUNT II: FHA AND R.C. CHAPTER 4112 RETALIATION

113. Plaintiffs reincorporate, as if fully realleged herein, the foregoing paragraphs of the Complaint.

114. Defendants Link Real Estate Group, Ambrosio and Condo Association retaliated against Plaintiff Bansek for exercising his rights under the FHA, 42 U.S.C. 3617, and R.C. 4112.02(I):

   a. Discriminated against Plaintiff Bansek because of his disability and treated him less favorably than similarly situated non-disabled individuals.

   b. Defendant Ambrosio asked Plaintiff Bansek not to park in disabled spaces after Plaintiff Bansek requested that a disabled space be assigned to him. Defendant Ambrosio tried to intimidate and coerce Plaintiff Bansek into not parking in the disabled spaces by telling him that other residents complained about Plaintiff Bansek parking in the disabled spaces and the residents were not happy with Plaintiff Bansek. Defendant Ambrosio made Plaintiff Bansek cry when Plaintiff Bansek asked Defendant Ambrosio where Plaintiff Bansek was supposed to park if he came home and both disabled spaces were taken by people without disability parking permits because Defendant Ambrosio refused to take enforcement action.

33

Defendant Ambrosio said Plaintiff Bansek would have to find somewhere else to park, specifically on-street parking.

c.  The owner of the red scooter moved the scooter into the parking access aisle, prohibiting Plaintiff Bansek from entering his or her vehicle in the disabled space for more than 4 days. The owner of the red scooter denied Plaintiff access to his choice of disabled spaces by parking his two motorized scooters and his black Porsche in the disabled spaces and access aisle without disabled parking permits.

d.  Another tenant denied Plaintiff Bansek access to disabled parking by parking his or her BMW motorcycle and lime green motorized scooter in clearly marked disabled spaces daily without a disabled parking permit.

e.  After requesting accommodations related to the trash chute and trash disposal, Defendants Ambrosio and Condo Association failed to accommodate Plaintiff Bansek and then retaliated against Plaintiff Bansek by (1) failing to accommodate Plaintiff Bansek by not assigning a maintenance worker to assist in pick up Plaintiff Bansek's trash from his unit when he requested such accommodation; (2) failing to accommodate Plaintiff Bansek by not changing the inaccessible trash chute hardware on the trash chutes on Floors 2-7; (3) failing to accommodate Plaintiff Bansek by not adjusting the closing speed of the trash chute doors on Floors 2-7 to allow at least a 5 second closing speed; (4) failing to accommodate Plaintiff by not adjusting the closing speed of the actual doors that need to be opened to access the in-wall trash chutes on Floors 2-7 to allow the required minimum door closing speed of 5 seconds on an accessible route; (5) sending out a building-wide email to all residents identifying Plaintiff Bansek as the disabled

person on the Second Floor who could not open up the trash chute and dispose of his trash properly, causing humiliation, anxiety, depression, and emotional distress; (6) asking residents of the Second Floor to throw Plaintiff Bansek's trash away for him, causing resentment against him and humiliation with an increase in anxiety, depression and emotional distress; (7) requesting residents of the Second Floor to discuss the situation amongst themselves, effectively violating Plaintiff Bansek's privacy by identifying him as a person with disabilities and causing humiliation, anxiety, depression and emotional distress; and (8) requesting that disabled persons who are unable to open the non-accessible trash chutes in the building due to disability limit the amount of trash bags placed next to the trash chutes, thus not allowing persons with disabilities an equal amount of access to trash disposal as persons without disabilities.

115. Defendants continue to blatantly disregard the ADA and FHA and violations thereof. Such behavior has perpetuated an attitude of apathy for the law and individuals with disabilities within staff and property owners.

116. As a result of the acts and conduct of the Defendant, Plaintiff has suffered and been damaged in the right to contract for and to otherwise rent the home he negotiated and contracted for and has incurred damages in the diminution of value in his housing.

117. The acts and conduct of the Defendants have caused and continue to cause the Plaintiff humiliation, embarrassment, emotional distress, and anxiety, and further had the purpose and effect of denying to the Plaintiff state and federally secured rights of fair housing.

118. The actions of the Defendants have been and continue to be intentional and in wanton and reckless disregard of the rights and feelings of the Plaintiff.

119.    As a result of the acts and conduct of the Defendant, Plaintiff Bansek has suffered and continues to suffer damages.

## COUNT III: FAILURE TO ACCOMMODATE
## UNDER THE FHA AND R.C. CHAPTER 4112

120.    Plaintiffs reincorporate, as if fully realleged herein, the foregoing paragraphs of the Complaint.

121.    Defendants Link Real Estate, Condo Association and Ambrosio failed to accommodate Plaintiff Bansek, including but not limited to, in the following ways:

a.      Refusing to engage any interactive process with Plaintiff Bansek despite his continual attempts to engage Defendants in working together.

a.      Failing to remove items, debris, trash, traffic cone, and floor mats from disabled spaces when requested.

b.      Replacing and/or allowing the replacement of the items, debris, trash, traffic cone, and floor mats removed from disabled parking back into disabled parking.

c.      Refusing to remove bicycles/bicycle storage racks that hand on the wall and impede into the disabled spaces, and failure to remove bicycles that are parked in the disabled spaces and access aisle when requested.

d.      Refusing to post "$500 Fine" signs when requested.

e.      Refusing to post a sign at a disabled space designating the space for Plaintiff Bansek when requested.

f.      Refusing to place the disabled signs at the proper height when requested.

g.      Refusing to send out a second resident wide email when requested mandating not to park in disabled spaces without the required permit.

h.     Refusing to provide the names, titles and contact information for the Homeowners' Association Board of Directors when requested.

i.     Refusing to ensure and provide access to the disabled spaces for persons with disabilities when requested as required under the FHA.

j.     Refusing to ensure and provide access to the building via accessible routes for persons with disabilities when requested as required under the FHA.

k.     Refusing to tow and/or fine vehicles, motorized scooters, motorcycles, and bicycles parked without a disabled parking permit in the disabled parking when requested numerous times.

l.     Failing to reply to Plaintiff Bansek by email, phone, or person when he called and left two voicemails to Defendant Link Real Estate stating a red scooter was parked in the disabled access aisle, blocking Plaintiff Bansek from having access to his vehicle. Plaintiff Bansek was blocked in for more than four days. Neither Defendant Link Real Estate nor the Homeowners' Association would assist Plaintiff Bansek and two the scooter to ensure him access to the disability spaces when requested.

m.     Refusing to assign a maintenance worker to assist Plaintiff Bansek with trash pick-up from his unit when he requested such accommodation.

n.     Refusing to change the inaccessible trash chute hardware on the trash chutes on Floors 2-7.

o.     Refusing to adjust the closing speed of the trash chute doors on Floors 2-7 to allow at least a 5 second closing speed.

p.     Refusing to adjust the closing speed of the actual doors that need to be opened to access the in-wall trash chutes on Floors 2-7 to allow the required minimum door closing speed of 5 seconds on an accessible route.

122.    As a result of the acts and conduct of the Defendant, Plaintiff Bansek has suffered and been damaged in the right to contract for and to otherwise rent the home he negotiated and contracted for and has incurred damages in the diminution of value in his housing.

123.    The acts and conduct of the Defendants have caused and continue to cause the Plaintiff humiliation, embarrassment, emotional distress, and anxiety, and further had the purpose and effect of denying to the Plaintiff state and federally secured rights of fair housing.

124.    The actions of the Defendants have been and continue to be intentional and in wanton and reckless disregard of the rights and feelings of the Plaintiff.

125.    As a result of the acts and conduct of the Defendant, Plaintiff Bansek has suffered and continues to suffer damages.

## COUNT IV: ADA AND R.C. CHAPTER 4112 VIOLATIONS

126.    Plaintiffs reincorporate, as if fully realleged herein, the foregoing paragraphs of the Complaint.

127.    Defendants have failed to design or construct The Jackson on High areas open to the public in accordance with 42 U.S.C. § 12183. The violations are outlined in paragraph 83(t)-(z), (bb)-(hh) and (nnn)-(ooo).

128.    By failing to design and construct The Jackson on High areas open to the public in accordance with the ADA, Defendants made public accommodations unavailable because of disability in violation of 42 U.S.C. § 12182, and parallel provisions under R.C. 4112.02(G).

129. By failing to design and construct the areas open to the public in accordance with the ADA, Defendants discriminated in the terms, conditions, or privileges of the place of public accommodation of The Jackson on High property in violation of the ADA, 42 U.S.C. § 12182, and parallel provisions under R.C. 4112.02(G).

130. As a result of the acts and conduct of the Defendant, Plaintiff Bansek has suffered and been damaged in the right to contract for and to otherwise rent the home he negotiated and contracted for and has incurred damages in the diminution of value in his housing.

131. The acts and conduct of the Defendants have caused and continue to cause the Plaintiff Bansek humiliation, embarrassment, emotional distress, and anxiety, and further had the purpose and effect of denying state and federally secured rights of fair housing.

132. The actions of the Defendants have been and continue to be intentional and in wanton and reckless disregard of the rights and feelings of the Plaintiff.

133. As a result of the acts and conduct of the Defendant, Plaintiff Bansek has suffered and continues to suffer damages.

**WHEREFORE**, Plaintiffs Jeff Bansek and Fair Housing Advocates Association, Inc. pray that the Court enter an Order that:

1. Declares that Defendants' policies and practices, as alleged herein, violate the federal and Ohio Fair Housing Acts.

2. Declares that Defendants are in violation of the Americans with Disabilities Act and the Federal and Ohio Fair Housing Acts.

3. Enjoins Defendants, their officers, employees, agents, successors, property owners, and all other persons in active concert or participation with any of them from:

a. Discriminating in the sale, or otherwise making unavailable or denying dwellings to buyers, and/or failing to accommodate on the basis of disability in violation of 42 U.S.C. § 3604(f)(1) and R.C. 4112.02(H).

b. Discriminating against any person in the terms, conditions, or privileges of owning a dwelling or in the provision of services or facilities in connection with such a dwelling, because of a handicap in violation of 42 U.S.C. § 3604(f)(2) and R.C. 4112.02(H).

c. Discriminating against any person in the terms, conditions of privileges of accessing the deck, pool, and public restroom because of a handicap in violation of 42 U.S.C. § 12183 and R.C. 4112.02(G).

d. Failing or refusing to take such affirmative steps as may be necessary to correct all violations of the Americans with Disabilities Act and Federal and Ohio Fair Housing Acts at Defendant The Jackson.

e. Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, the victims of Defendants' unlawful practices to the position they would have been in but for the discriminatory conduct; and,

f. Designing and/or constructing any covered multifamily dwellings in the future that do not contain the accessibility and adaptability features required by 42 U.S.C. § 3604(f)(3)(C) and R.C. 4112.02(H).

4. Awards monetary damages under 42 U.S.C. §§ 3612(o)(3), 3613(c)(1) and 3614(d)(1)(B) and R.C. § 4122.99 to Plaintiffs, and to any other person harmed by Defendants' discriminatory policies and practices.

5.      Awards Attorneys' Fees and Costs.

6.      Requires Defendants to undergo Fair Housing Training and amend their policies

and rules in accordance with the Fair Housing Act.

7.      Awards any other damages to which Plaintiffs may be entitled and/or that this

Court may deem just and equitable.

RESPECTFULLY SUBMITTED,

*s/Laren E. Knoll*
Laren E. Knoll (0070594)
THE KNOLL LAW FIRM, LLC
7240 Muirfield Drive, Suite 120
Dublin, Ohio 43017
T: 614-372-8890; F: 614-452-4850
Email: lknoll@knolllaw.com
*Counsel for Plaintiffs*

*s/ Andrew L. Margolius*
Andrew L. Margolius (0003402)
Emily E. Gilbert (0080174)
MARGOLIUS, MARGOLIUS & ASSOCIATES
55 Public Square, Suite 1100
Cleveland, Ohio 44113
T: (216) 621-2034; F: (216) 621-1908
Email: andrew@margoliuslaw.com
*Co-Counsel for Plaintiffs*

## JURY DEMAND

Plaintiff requests a trial by a jury of eight (8) persons on all issues triable by a jury.

*s/Laren E. Knoll*
Laren E. Knoll (0070594)
The Knoll Law Firm, LLC
*Trial Attorney for Plaintiffs*